IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NEW HOPE FELLOWSHIP, INC.                    PLAINTIFF

    vs.                    CASE No. B:04CV259

CITY OF OMAHA, NEBRASKA                       DEFENDANT

### MEMORANDUM OPINION

This matter is before the Court for decision following a one and one-half day trial that began on October 31, 2005. The parties were given until December 2, 2005 to submit simultaneous, post-trial briefs. Those briefs, as well as the pre-trial briefs, summary judgment briefs, and testimony and evidence submitted at trial, have been considered by the Court.

Plaintiff brings this action under the Fair Housing Act, as amended, Title 42 U.S.C. § 3601, *et seq.,* the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.,* and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* Plaintiff alleges that Defendant discriminated against it by failing to grant it a special use permit to occupy a home as a residential treatment center for individuals recovering from alcohol and drug addiction. Defendant denies all allegations of the Plaintiff's and contends that Plaintiff failed to seek a waiver of a requirement of the special use permit.

The following will constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of

-1-

Civil Procedure.

## Findings of Fact

1.  New Hope ("New Hope") is a non-profit charitable "501(c)(3)"
    corporation, organized under the laws of the State of
    Nebraska, with its principal place of business in Omaha, with
    the mission to provide community-based residential treatment
    for persons recovering from alcoholism and drug addiction.

2.  The City of Omaha ("City") is a political subdivision in
    Douglas County, Nebraska, organized and existing as a city of
    the metropolitan class pursuant to the laws of the State of
    Nebraska.

3.  Kathleen McCallister ("McCallister") is a Douglas County
    Commissioner with seventeen years in public service.  In 2002
    or 2003, McCallister identified a need for women leaving jail
    to find substance abuse treatment.  There is a shortage of
    community-based residential treatment facilities in the area
    for there is a six-month waiting period for admission.

4.  McCallister and others obtained an existing corporation, and
    renamed it New Hope Fellowship, Inc.  New Hope was to provide
    community-based residential treatment to women recovering from
    alcohol and/or drug addiction.

5.  Persons recovering from alcohol and/or drug addiction are
    persons with disabilities under the Fair Housing Act, Section
    504 of the Rehabilitation Act of 1973, and the Americans with

-2-

Disabilities Act.

6.    In December of 2003, New Hope sought to purchase a house located at 101 North 39th Street in Omaha for use as a residential treatment facility ("Home").   The Home contained approximately 6,000 square feet of living space in eight bedrooms and six to seven bathrooms and was priced at $380,000, and the sale was contingent upon inspection, appraisal, and approval by all required governmental boards for use as a residential drug treatment facility. (Def.'s Ex. 123.)

7.    New Hope expended $4,263.50 in preparation of purchasing the Home: $1,643.50 architectural services, $60 mold and radon testing, $560 property inspection, and $2,000 in earnest money.  (Pl.'s Exs. 13-15.)

8.    The Home is located at the northeast corner of 39th and Dodge Street, which is a main thoroughfare and  heavily traveled. Residents of the home would have easy access to public transportation, health care facilities, and job opportunities.

9.    New Hope needed to house 16 to 20 women in the Home in order to be financially viable.  The women would be recovering from drug or alcohol abuse, demonstrate sobriety of at least 30 days, and be willing to stay from six months up to one year. New Hope would receive referrals from McCallister, a Yellow Pages advertisement, local churches, Douglas County Drug

-3-

Court, and individuals.  New Hope would employ persons to be in the Home 24 hours a day, seven days a week.  Residents would not be allowed to drive or have automobiles at the Home.

10. New Hope would provide on-site alcohol and drug counseling and drug testing to ensure that residents remain clean and sober.

11. Omaha Municipal Code Chapter 55 contains the zoning regulations for the City.  Sections 55-41 through 55-51 contain definitions for the various classifications of uses that occur in the City.  Chapter 55 divides the City into various zoning districts, as described at §§ 55-61 through 55-70.  The regulations for a zoning district set forth the following:  uses that are "permitted" as of right; uses that are allowed only upon issuance of a conditional use permit; and uses that are allowed only upon issuance of a special use permit.

12. The Home is located on property that is zoned community commercial (CC).  This property has been zoned CC for the past 20 - 30 years.  In the CC district, permitted uses are listed in § 55-363; uses allowed only upon issuance of a conditional use permit are listed in § 55-364; and uses allowed only upon issuance of a special use permit are listed in § 55-365.  As a CC zone, the Home could be used as a pawnshop, gas station, cocktail lounge, liquor store, restaurant, emergency residential care, hospital services, day care, hotel/motel, or

-4-

other similar commercial use as a matter of right.

13. The property adjacent to the Home to the east is zoned CC.

14. The property adjacent to the Home to the west is zoned GC-General Commercial. There is a former Travel Lodge on this site.

15. The property adjacent to the Home to the south is also zoned GC-General Commercial. There is a commercial business, Paycheck Advance, on this site.

16. The property adjacent to the Home to the north is zoned R-7 Medium Density Residential. R-7 is a residential classification intended for residential uses from single-family to multi-family.

17. To the southwest of the Home is a University of Nebraska at Omaha, Pi Kappa Alpha social fraternity residence.

18. Within two blocks of the Home, there are commercial enterprises to include a gas station, Subway sandwich shop, laundry, cigarette shop, and Taco Bell.

19. All of the properties located between Davenport Street to Douglas Street and between 38th Street and 40th Street are zoned for either commercial or multi-family residential use.

20. On or about January 12, 2004, New Hope filed an application for a special use permit, pursuant to the zoning regulations for a CC district, to operate the Home as a residence for women recovering from alcoholism and drug addiction. (Def.'s

-5-

Ex. 103.)

21. The City Planning Department helped McAllister complete the application. After a discussion with officials about the proposed use of the Home, on the application, in the blank after the term "proposed use type," McCallister filled in the term "group care facility."[1]

22. In the CC district, a group care facility must obtain a special use permit.[2] A group care facility is also subject to a spacing requirement.[3]

23. The Planning Department reviewed New Hope's application and issued its Recommendation Report on January 26, 2004. (Def.'s Ex. 106.) The Planning Department recommended to the Planning

---

[1]Omaha Municipal Code § 55-46(l) defines the use type "group care facility" as a facility licensed or approved by the state or other appropriate agency, which provides for the care and short- or long-term overnight occupancy of more than three unrelated persons who require supervision while under a program alternative to imprisonment, including but not limited to pre-release, work release, and probationary programs.

Omaha Municipal Code § 55-764(c)(2) requires the applicant for a permit to operate a "group care facility" to provide the City with the following information: a) the names and address of individuals operating the facility; b) a description of the services that the facility will provide; c) the maximum number of staff and residents of the facility; d) copies of licenses or applications for licenses to operate the facility obtained from or submitted to appropriate public agencies or departments; and e) the location of any other group care facilities operated by the applicant.

[2]The procedure for obtaining a special use permit is described in Omaha Municipal Code § 55-864: The Planning Department and planning director review the proposal and prepare a recommendation. That recommendation is presented to the City Planning Board. The Planning Board holds a public hearing on the application, and renders a recommendation. The recommendations are ten transmitted tot he City Council for approval or denial of the special use permit. Conditions can be placed on the special use permit, in addition to the supplemental use regulations from Omaha Municipal Code § 55-764(c).

[3]Omaha Municipal Code § 55-764(c)(l): The distance between a proposed group care facility and any existing group care facility shall be at least one-half mile, measured between nearest lot lines.

-6-

Board that it approve New Hope's request for a special use permit stating that "the residential nature of the facility would be compatible with the character of the neighborhood", and subject to the following conditions: (1) Providing a minimum of ten on-site parking stalls or receiving a Zoning Board of Appeals ("ZBA") waiver; and (2) Compliance with the site and operating plans.   The Planning Department then forwarded its recommendation to the Planning Board for a hearing and approval of the special use permit.

24.   During the time that New Hope's special use permit application was pending, the neighbors and/or surrounding neighborhood associations alerted the City Planning Department that another "group care facility" was operating within one-half mile of the Home.

25.   City Planner Gary Hall determined the Santa Monica House had been issued a certificate of occupancy for a group care facility at 130 North 39th Street.   The Santa Monica House was across the street, and two lots down, from the proposed Home. Hall determined that the two facilities were located 155.5 feet apart, measured from the nearest lot lines.

26.   The City received numerous letters and e-mails from neighbors surrounding the Home, which were distributed to the Planning Board and the City Council for their consideration, most encouraging the City to deny New Hope's application for a

-7-

special use permit.  The letters included one from the Mayor of Omaha, Mike Fahey.  (Pl.'s Ex. 11.)

27. On February 4, 2004, and on March 3, 2004, the Planning Board held public hearings to consider the special use permit for the Home.  At these public hearings, the Planning Board voted unanimously to "lay over" the decision on the application until New Hope could meet with the neighbors and all the Planning Board members could be in attendance, respectively.

28. On March 30, 2004, the Planning Department provided a Memorandum to the Planning Board that noted the other group care facility operating within the one-half mile separation zone, but maintained that the City should nonetheless issue the permit subject to the previous conditions regarding parking spaces and compliance with site and operating plans. (Def.'s Ex. 113.)  The Memorandum set out the analysis that the property is zoned to a commercial classification; the proposed re-use is residential in nature and protects the character of the existing house; the proposed group care facility would have a comparably low impact on the neighborhood; the residents are closely supervised and make minimal traffic demands on the area; and the home is sufficiently large enough to accommodate the residents.  In addition, the Planning Department proposed that the property be "down-zoned" to a single-family residential classification

as a condition of granting the special use permit.  The City

may impose conditions such as down-zoning of the property when

approving a special use permit.

29.  No other lots within a two block radius of the Home are zoned

R-5.  (Def.'s Ex. 104.)

30.  On March 5, 2004, the counsel for New Hope, directed a three-

page letter to the City requesting the City to reclassify the

proposed use of the Home to "Group Residential".[4]  (Def.'s Ex.

111.)  Moore stated the Home would not be a facility that

would house persons "who require supervision while under a

program alternative to imprisonment" making a group care

facility classification inappropriate.  In the CC district, a

group residential must only obtain a conditional use permit.[5]

31.  On March 15, 2004, the City, through its attorney,  responded

to New Hope's letter concluding that the proposed use of the

home "fits most appropriately" under the use type defining of

"Group Care Facility."  (Def.'s Ex. 112.)  The City's letter

informed New Hope that the Planning Department would

nonetheless recommend that the City approve the special use

permit.  The City also indicated it would support a variance

---

[4]Omaha Municipal Code § 55-43(f) defines "group residential": The use of
a site for a residence by more than three unrelated persons, not defined as
a family, on a weekly or longer basis.  This use includes a group of handicapped
persons living as a family unit while receiving on-premises care.

[5]The conditional use permit procedure is similar to that of the special
use permit procedure, except that a conditional use permit is issued by the
Planning Board and not the City Council.  In addition, a group residential use
is subject to supplemental use regulations at § 55-763(c).

or waiver from the separation requirement from the ZBA and
that the Planning Department intended to draft a
recommendation to repeal the separation requirement in Code §
55-764.

32. On April 7, 2004, at the Planning Board meeting, New Hope
requested a reasonable accommodation to operate the New Hope
Home because the residents of the home would be persons with
disabilities pursuant to the FHA, ADA, and other applicable
statutes. (Def.'s Ex. 115 at 13.) Eight neighbors of the New
Home appeared and voiced opposition to the location, including
Jim Vokal, an Omaha City Council member. The Home is located
in his district. The Planning Board voted 6 to 1 in favor of
recommending approval of New Hope's special use permit to the
City Council subject to: 1) Providing a minimum of 10 on-site
parking stalls or receipt of a ZBA waiver; 2) Compliance with
the site and operating plans; 3) That the applicant agrees to
apply to re-zone the property to a R5 residential
classification once they are in operation; and 4) That the
applicant request a waiver of the spacing requirement from the
ZBA. (Def.'s Ex. 115 at 50.)

33. On May 3, 2004, New Hope filed an application with the ZBA for
a waiver of the parking space and spacing requirements.
(Def.'s Ex. 116.) The ZBA placed New Hope's application on
its June agenda.

34. Also on May 3, 2004, Moore sent a letter to the City Planning Department appealing New Hope's classification of a "group care facility" and requesting a waiver/variance of the parking and spacing requirements as a reasonable accommodation. (Pl.'s Ex. 3.)

35. On May 25, 2004, New Hope appeared before the City Council to request a special use permit to operate the treatment facility as a matter of right or as a reasonable accommodation to persons of disabilities. Four neighbors of the New Hope Home spoke in opposition citing the spacing requirement and the saturation of group homes in the area as reasons. The City Council voted 4-2-1 to deny the special use permit.

36. Dan Welch, a City Council member for five years, voted to deny the special use permit because of the city ordinance on spacing requirements, but testified that he thought it was a good use of the property.

37. Vokal voted to deny the special use permit because of spacing requirements. Vokal stated the neighborhood had done its "fair share" because of the Santa Monica house across the street. (Def.'s Ex. 122 at 13.) Vokal informed the City Council that New Hope was to appear before the ZBA in June. (Def.'s Ex. 122 at 23.)

38. Mark Kraft, a City Council member from 1997-2005, voted to deny the special use permit. He testified at trial that his

concerns were the congestion of traffic, parking, and concerns of the neighborhood, but his major concern was the city ordinance regarding spacing requirements.

39. Chuck Sigerson, a City Council member for four and one-half years, voted to deny the special use permit. He testified at trial it was because of the violation of the city ordinance regarding spacing requirements. He did not disagree that there is a need for treatment facilities like New Hope would provide.

40. New Hope withdrew its application to the ZBA for a wavier of the spacing and parking stall requirements after the City Council denied its request for a special use permit.

41. Rod Phipps ("Phipps"), manager of the Planning Division at the time of New Hope's application, testified at trial that there was no area of concentration of group homes.

42. The City has no specific reasonable accommodation provision in its statutes.

43. Phipps testified that he did not know if the City Council had to accept a wavier from the ZBA, but he was not aware of anytime that the City did not accept a waiver from the ZBA.

44. The Hansens, owners of the Home, subsequently sold the property to Michael Narducci for $408,000 on a land contract. Narducci is currently using the home as a private residence, but indicated he would sell the home for the

"right price."

## Conclusions of Law

1. The City did not intentionally discriminate against New Hope.

2. The City failed to make a reasonable accommodation in not granting a special use permit to New Hope.

## Discussion

1. The Fair Housing Act ("AHA") prohibits a municipality from discriminating against persons with disabilities "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of-(A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." 42. U.S.C. § 3604 (f)(1).

2. Residents and prospective residents of group home for recovering alcoholics and drug addicts were persons with a "handicap" within meaning of the FHA. *See Tsombanidis v. City of West Haven*, 180 F.Supp.2d 262 (D.Conn. 2001), *aff'd in part, rev'd in part,* 352 F.3d 565 (2nd Cir. 2003).

3. Congress explicitly intended for the FHA to apply to zoning ordinances and other laws that would restrict the placement of group homes. *Oconomowoc Residential Programs, Inc. v. City of Milwaukee,* 300 F.3d 775, 782 (7th Cir. 2002) (citing H.R.Rep.

-13-

No. 100-711, at 24 (1988)).

4.  Discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604 (f)(3)(B).

5.  A plaintiff may show discrimination which would be a violation of the FHA or ADA in three ways, to wit:  (1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to make a reasonable accommodation. *Tsombanidis* at 283.  As plaintiff has not alleged discriminatory impact, the Court will analyze intentional discrimination and a refusal to make a reasonable accommodation.

**<u>Intentional discrimination</u>**

6.  To establish intentional discrimination, plaintiff must prove that a motivating factor behind the City's refusal to grant plaintiff a special use permit was the residents' status as recovering drug addicts and alcoholics. *See Vill. of Arlington Heights. V. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).  "The critical inquiry is whether a discriminatory purpose was a 'motivating factor' in the decision or actions" of the City. *Tsombanidis*, 129 F.Supp.2d at 151.

7.  Factors to be considered in evaluating a claim of intentional

-14-

discrimination under the FHA or ADA include: (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; (5) departures from normal substantive criteria; and (6) legislative or administrative history, especially contemporary statements by members of the decision-making body. *See Arlington Heights* at 267-268. *See also Tsombanidis* 352 F. 3d. 565, 580.

8. This Court concludes that a discriminatory purpose was not a motivating factor in the decision of the City Council to deny Plaintiff a special use permit. At the May 25, 2004, City Council meeting, the record is replete with statements by the City Council members that they were voting to deny the special use permit based on the spacing requirement. While there are suggestions of politics and appeals to voters in the impacted area, the Court can only conclude the City did not intentionally discriminate against Plaintiff.

9. Even if Plaintiff had shown a discriminatory purpose was a motivating factor, Defendant has shown it would have made the same decision in light of a discriminatory purpose. Once plaintiffs show that defendant's decision was motivated at least in part by discriminatory animus, the burden shifts to the defendant to prove that it would have made the same

decision even if it had not been motivated by an unlawful purpose.  *See Arlington Heights,* 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21.  Each City Council member who testified at trial stated the opposition to  the special use permit was because of the ordinance regarding the spacing requirement.

10.  Plaintiff argues that the only reason it was denied a special use permit was the City's claim that the area around the Home had too many group homes for persons with disabilities and that the neighbors had done their "fair share".  Based on the testimony presented at trial, we disagree.

**Reasonable accommodation**

11.  Discrimination, under the FHA, includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.  42 U.S.C. § 3604(f)(3)(B).  The FHA requires accommodation if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling.  42 U.S.C. § 3604(f)(3)(B).

12.  Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  Like

the FHA, under the ADA, a public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices, or services when needed. *Oconomowoc Residential Programs, Inc., v. City of Milwaukee,* 300 F.3d 775 (7th Circ. 2002). The requirements for reasonable accommodation under the ADA are the same as those under the FHA. 42 U.S.C. § 12131(2).

13. An accommodation is reasonable if it is "necessary to afford a handicapped person the equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

14. The Eighth Circuit requires a plaintiff to make an initial showing that an accommodation is reasonable, but then places the burden on the defendant to show that the accommodation is unreasonable. *See e.g., Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 950 (8th Cir. 1999). An "unreasonable accommodation" imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program. *Oconomowoc Residential Programs, Inc., v. City of Milwaukee,* 300 F.3d 775 (7th Circ. 2002).

15. Whether a requested accommodation is necessary for purposes of ADA and FHA requires a showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability. *Oconomowoc,* 300 F.3d at 784.

-17-

16.  The City contends that the reasonable accommodation claim
     cannot be presented because New Hope failed to pursue the
     City's established procedure for waiving the zoning code
     requirements.  The City cites *Oxford House-C v. City of St.
     Louis,* 77 F.3d 249, (8th Cir. 1996), to support this
     proposition.   In *Oxford House-C*, the court found that the
     Plaintiff's refusal to apply for a zoning variance was fatal
     to their reasonable accommodation claim.  *Id.* at 253.   New
     Hope argues that in *Oxford House-C* and the other cases relied
     upon by the City, the plaintiffs refused to apply for a
     variance or use permit and that New Hope did not refuse and we
     agree with New Hope.   The cases cited by the attorney are
     distinguishable from the present case for New Hope applied for
     a waiver from the ZBA based on the recommendation from the
     Planning Board, but withdrew it only after the City Council
     voted to deny the special use permit.   We find New Hope's
     reasonable accommodation claim can and should be resolved.

17.  New Hope asked the City to make a reasonable accommodation
     from the zoning ordinance in granting the special use permit.
     New Hope asserts that waving the zoning ordinance is
     reasonable because there is an undisputed need in the
     community for residential treatment facilities for women
     recovering from drug and alcohol addiction.   Santa Monica
     House is the only other residential treatment facility for

-18-

women in Omaha.  There is a waiting period of up to six months for those seeking treatment.  New Hope would provide a residential setting for the women to develop support to help improve their chance of recovery.

18. New Hope also asserts the accommodation is necessary to "meet the extraordinary demand for community-based residential treatment for persons recovering from alcoholism and drug addiction."  The waiting period for a woman wanting to enter treatment is up to six months.  Residents of the Home would have easy access to transportation, job opportunities, and healthcare services.  We find the accommodation to be necessary as it would affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.  We also find the accommodation to be reasonable as it will afford a handicapped person the equal opportunity to use and enjoy the Home.  The burden then shifts to the City to show the accommodation is unreasonable.

19. While the City does not dispute the need for residential treatment facilities in Omaha, it argues the accommodation is unreasonable because it would require a fundamental alteration of the City zoning regulation, specifically a 94 percent reduction of the spacing requirement.  The spacing requirement was enacted to control the concentration of group care facilities.

-19-

20.  Granting a special use permit to allow two group care facilities to co-exist within one-half mile of each other admittedly results in an alteration of the zoning code, but it is not a fundamental alteration.  Phipps testified that there was no saturation of group homes anywhere in the city. Therefore, the granting of a special use permit would not result in the concentration of group homes the spacing requirement was enacted to prevent.  New Hope sought to locate a residential facility in a commercially zoned area where uses such as hospital services, hotels/motels, and emergency residential care could locate as a matter of right.  The Planning Department recommended the approval of the special use permit stating that the "residential nature of this facility would be compatible with the character of the neighborhood."  The Planning director, who was aware of another group care facility nearby, noted in a memo to the Planning board, that the proposed re-use was residential in nature and protected the character of the existing house; that there would be comparably low impact on the neighborhood; and that residents would be closely supervised and make minimal traffic demands on the area.

20.  This Court finds that the City failed to make a reasonable accommodation in granting New Hope a special use permit to occupy the Home for use as a residential drug treatment

-20-

facility for women.

### Injunctive Relief and Damages

1.  New Hope is awarded $2,263.50 in compensatory damages for the losses incurred in preparation of purchasing the Home.  The loss of net income is too speculative for the Court to consider at this time.  The $2,000 escrow amount may be an appropriate element of damages if those funds are not utilized as part of the payment for the purchase of the Home.

2.  New Hope is awarded reasonable attorney's fees and costs.  New Hope is ordered to file within 30 days of entry of this judgment, a motion detailing such fees and costs.

3.  New Hope is given 120 days within which to attempt to purchase the Home located at 101 North 39th Street, Omaha, Nebraska. Depending upon purchase price, the Court will consider additional damages if New Hope is able to purchase the Home.

4.  If the purchase is effected and upon application by New Hope for a permit to operate a group home at 101 North 39th Street, Omaha, an injunction is issued requiring the City to grant New Hope any and all necessary permits to operate the Home as a reasonable accommodation, except the City reserves the right to assure that the Home is operated according to all codes and other legal requirements.

### Order

Based on the foregoing, the Court concludes that Defendant failed to make a reasonable accommodation in granting Plaintiff a

-21-

special use permit.  Accordingly, judgment is for the Plaintiff.
Plaintiff is awarded $2,263.50 in compensatory damages, reasonable
attorney's fees and costs, injunctive relief as provided herein to
obtain necessary permits to operate the Home, and other monetary
and equitable relief to be determined.


        IT IS SO ORDERED.

                              /s/Robert T. Dawson____
                              Robert T. Dawson
                              United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NEW HOPE FELLOWSHIP, INC.                          PLAINTIFF

     vs.          CASE No. B:04CV259

CITY OF OMAHA, NEBRASKA                            DEFENDANT

**<u>MEMORANDUM OPINION</u>**

This matter is before the Court for decision following a one and one-half day trial that began on October 31, 2005.  The parties were given until December 2, 2005 to submit simultaneous, post-trial briefs.  Those briefs, as well as the pre-trial briefs, summary judgment briefs, and testimony and evidence submitted at trial, have been considered by the Court.

Plaintiff brings this action under the Fair Housing Act, as amended, Title 42 U.S.C. § 3601, *et seq.,* the Americans with Disabilities Act, 42 U.S.C. § 12131, *et seq.,* and the Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* Plaintiff alleges that Defendant discriminated against it by failing to grant it a special use permit to occupy a home as a residential treatment center for individuals recovering from alcohol and drug addiction. Defendant denies all allegations of the Plaintiff's and contends that Plaintiff failed to seek a waiver of a requirement of the special use permit.

The following will constitute the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of

-1-

Civil Procedure.

## Findings of Fact

1.  New Hope ("New Hope") is a non-profit charitable "501(c)(3)" corporation, organized under the laws of the State of Nebraska, with its principal place of business in Omaha, with the mission to provide community-based residential treatment for persons recovering from alcoholism and drug addiction.

2.  The City of Omaha ("City") is a political subdivision in Douglas County, Nebraska, organized and existing as a city of the metropolitan class pursuant to the laws of the State of Nebraska.

3.  Kathleen McCallister ("McCallister") is a Douglas County Commissioner with seventeen years in public service. In 2002 or 2003, McCallister identified a need for women leaving jail to find substance abuse treatment. There is a shortage of community-based residential treatment facilities in the area for there is a six-month waiting period for admission.

4.  McCallister and others obtained an existing corporation, and renamed it New Hope Fellowship, Inc. New Hope was to provide community-based residential treatment to women recovering from alcohol and/or drug addiction.

5.  Persons recovering from alcohol and/or drug addiction are persons with disabilities under the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and the Americans with

Disabilities Act.

6.   In December of 2003, New Hope sought to purchase a house located at 101 North 39th Street in Omaha for use as a residential treatment facility ("Home").   The Home contained approximately 6,000 square feet of living space in eight bedrooms and six to seven bathrooms and was priced at $380,000, and the sale was contingent upon inspection, appraisal, and approval by all required governmental boards for use as a residential drug treatment facility. (Def.'s Ex. 123.)

7.   New Hope expended $4,263.50 in preparation of purchasing the Home: $1,643.50 architectural services, $60 mold and radon testing, $560 property inspection, and $2,000 in earnest money.  (Pl.'s Exs. 13-15.)

8.   The Home is located at the northeast corner of 39th and Dodge Street, which is a main thoroughfare and  heavily traveled. Residents of the home would have easy access to public transportation, health care facilities, and job opportunities.

9.   New Hope needed to house 16 to 20 women in the Home in order to be financially viable.  The women would be recovering from drug or alcohol abuse, demonstrate sobriety of at least 30 days, and be willing to stay from six months up to one year. New Hope would receive referrals from McCallister, a Yellow Pages advertisement, local churches, Douglas County Drug

-3-

Court, and individuals.  New Hope would employ persons to be in the Home 24 hours a day, seven days a week.  Residents would not be allowed to drive or have automobiles at the Home.

10. New Hope would provide on-site alcohol and drug counseling and drug testing to ensure that residents remain clean and sober.

11. Omaha Municipal Code Chapter 55 contains the zoning regulations for the City.  Sections 55-41 through 55-51 contain definitions for the various classifications of uses that occur in the City.  Chapter 55 divides the City into various zoning districts, as described at §§ 55-61 through 55-70.  The regulations for a zoning district set forth the following:  uses that are "permitted" as of right; uses that are allowed only upon issuance of a conditional use permit; and uses that are allowed only upon issuance of a special use permit.

12. The Home is located on property that is zoned community commercial (CC).  This property has been zoned CC for the past 20 - 30 years.  In the CC district, permitted uses are listed in § 55-363; uses allowed only upon issuance of a conditional use permit are listed in § 55-364; and uses allowed only upon issuance of a special use permit are listed in § 55-365.  As a CC zone, the Home could be used as a pawnshop, gas station, cocktail lounge, liquor store, restaurant, emergency residential care, hospital services, day care, hotel/motel, or

-4-

other similar commercial use as a matter of right.

13. The property adjacent to the Home to the east is zoned CC.

14. The property adjacent to the Home to the west is zoned GC-General Commercial. There is a former Travel Lodge on this site.

15. The property adjacent to the Home to the south is also zoned GC-General Commercial. There is a commercial business, Paycheck Advance, on this site.

16. The property adjacent to the Home to the north is zoned R-7 Medium Density Residential. R-7 is a residential classification intended for residential uses from single-family to multi-family.

17. To the southwest of the Home is a University of Nebraska at Omaha, Pi Kappa Alpha social fraternity residence.

18. Within two blocks of the Home, there are commercial enterprises to include a gas station, Subway sandwich shop, laundry, cigarette shop, and Taco Bell.

19. All of the properties located between Davenport Street to Douglas Street and between 38th Street and 40th Street are zoned for either commercial or multi-family residential use.

20. On or about January 12, 2004, New Hope filed an application for a special use permit, pursuant to the zoning regulations for a CC district, to operate the Home as a residence for women recovering from alcoholism and drug addiction. (Def.'s

-5-

Ex. 103.)

21.   The City Planning Department helped McAllister complete the application.   After a discussion with officials about the proposed use of the Home, on the application, in the blank after the term "proposed use type," McCallister filled in the term "group care facility."[1]

22.   In the CC district, a group care facility must obtain a special use permit.[2]  A group care facility is also subject to a spacing requirement.[3]

23.   The Planning Department reviewed New Hope's application and issued its Recommendation Report on January 26, 2004.  (Def.'s Ex. 106.)  The Planning Department recommended to the Planning

---

[1]Omaha Municipal Code § 55-46(1) defines the use type "group care facility" as a facility licensed or approved by the state or other appropriate agency, which provides for the care and short- or long-term overnight occupancy of more than three unrelated persons who require supervision while under a program alternative to imprisonment, including but not limited to pre-release, work release, and probationary programs.

Omaha Municipal Code § 55-764(c)(2) requires the applicant for a permit to operate a "group care facility" to provide the City with the following information: a) the names and address of individuals operating the facility; b) a description of the services that the facility will provide; c) the maximum number of staff and residents of the facility; d) copies of licenses or applications for licenses to operate the facility obtained from or submitted to appropriate public agencies or departments; and e) the location of any other group care facilities operated by the applicant.

[2]The procedure for obtaining a special use permit is described in Omaha Municipal Code § 55-864: The Planning Department and planning director review the proposal and prepare a recommendation.  That recommendation is presented to the City Planning Board.  The Planning Board holds a public hearing on the application, and renders a recommendation.  The recommendations are ten transmitted tot he City Council for approval or denial of the special use permit. Conditions can be placed on the special use permit, in addition to the supplemental use regulations from Omaha Municipal Code § 55-764(c).

[3]Omaha Municipal Code § 55-764(c)(1):  The distance between a proposed group care facility and any existing group care facility shall be at least one-half mile, measured between nearest lot lines.

-6-

Board that it approve New Hope's request for a special use permit stating that "the residential nature of the facility would be compatible with the character of the neighborhood", and subject to the following conditions: (1) Providing a minimum of ten on-site parking stalls or receiving a Zoning Board of Appeals ("ZBA") waiver; and (2) Compliance with the site and operating plans.  The Planning Department then forwarded its recommendation to the Planning Board for a hearing and approval of the special use permit.

24.  During the time that New Hope's special use permit application was pending, the neighbors and/or surrounding neighborhood associations alerted the City Planning Department that another "group care facility" was operating within one-half mile of the Home.

25.  City Planner Gary Hall determined the Santa Monica House had been issued a certificate of occupancy for a group care facility at 130 North 39th Street.  The Santa Monica House was across the street, and two lots down, from the proposed Home. Hall determined that the two facilities were located 155.5 feet apart, measured from the nearest lot lines.

26.  The City received numerous letters and e-mails from neighbors surrounding the Home, which were distributed to the Planning Board and the City Council for their consideration, most encouraging the City to deny New Hope's application for a

special use permit.  The letters included one from the Mayor
of Omaha, Mike Fahey.  (Pl.'s Ex. 11.)

27.  On February 4, 2004, and on March 3, 2004, the Planning Board
held public hearings to consider the special use permit for
the Home.  At these public hearings, the Planning Board voted
unanimously to "lay over" the decision on the application
until New Hope could meet with the neighbors and all the
Planning Board members could be in attendance, respectively.

28.  On March 30, 2004, the Planning Department provided a
Memorandum to the Planning Board that noted the other group
care facility operating within the one-half mile separation
zone, but maintained that the City should nonetheless issue
the permit subject to the previous conditions regarding
parking spaces and compliance with site and operating plans.
(Def.'s Ex. 113.)  The Memorandum set out the analysis that
the property is zoned to a commercial classification; the
proposed re-use is residential in nature and protects the
character of the existing house; the proposed group care
facility would have a comparably low impact on the
neighborhood; the residents are closely supervised and make
minimal traffic demands on the area; and the home is
sufficiently large enough to accommodate the residents.  In
addition, the Planning Department proposed that the property
be "down-zoned" to a single-family residential classification

-8-

as a condition of granting the special use permit.  The City may impose conditions such as down-zoning of the property when approving a special use permit.

29. No other lots within a two block radius of the Home are zoned R-5.  (Def.'s Ex. 104.)

30. On March 5, 2004, the counsel for New Hope, directed a three-page letter to the City requesting the City to reclassify the proposed use of the Home to "Group Residential".[4]  (Def.'s Ex. 111.)  Moore stated the Home would not be a facility that would house persons "who require supervision while under a program alternative to imprisonment" making a group care facility classification inappropriate.  In the CC district, a group residential must only obtain a conditional use permit.[5]

31. On March 15, 2004, the City, through its attorney,  responded to New Hope's letter concluding that the proposed use of the home "fits most appropriately" under the use type defining of "Group Care Facility."  (Def.'s Ex. 112.)  The City's letter informed  New  Hope  that  the  Planning  Department  would nonetheless recommend that the City approve the special use permit.  The City also indicated it would support a variance

_____

[4]Omaha Municipal Code § 55-43(f) defines "group residential": The use of a site for a residence by more than three unrelated persons, not defined as a family, on a weekly or longer basis.  This use includes a group of handicapped persons living as a family unit while receiving on-premises care.

[5]The conditional use permit procedure is similar to that of the special use permit procedure, except that a conditional use permit is issued by the Planning Board and not the City Council.  In addition, a group residential use is subject to supplemental use regulations at § 55-763(c).

or waiver from the separation requirement from the ZBA and that the Planning Department intended to draft a recommendation to repeal the separation requirement in Code § 55-764.

32. On April 7, 2004, at the Planning Board meeting, New Hope requested a reasonable accommodation to operate the New Hope Home because the residents of the home would be persons with disabilities pursuant to the FHA, ADA, and other applicable statutes. (Def.'s Ex. 115 at 13.)  Eight neighbors of the New Home appeared and voiced opposition to the location, including Jim Vokal, an Omaha City Council member.  The Home is located in his district.  The Planning Board voted 6 to 1 in favor of recommending approval of New Hope's special use permit to the City Council subject to: 1) Providing a minimum of 10 on-site parking stalls or receipt of a ZBA waiver; 2) Compliance with the site and operating plans; 3) That the applicant agrees to apply to re-zone the property to a R5 residential classification once they are in operation; and 4)  That the applicant request a waiver of the spacing requirement from the ZBA.  (Def.'s Ex. 115 at 50.)

33. On May 3, 2004, New Hope filed an application with the ZBA for a waiver of the parking space and spacing requirements. (Def.'s Ex. 116.)  The ZBA placed New Hope's application on its June agenda.

34. Also on May 3, 2004, Moore sent a letter to the City Planning Department appealing New Hope's classification of a "group care facility" and requesting a waiver/variance of the parking and spacing requirements as a reasonable accommodation. (Pl.'s Ex. 3.)

35. On May 25, 2004, New Hope appeared before the City Council to request a special use permit to operate the treatment facility as a matter of right or as a reasonable accommodation to persons of disabilities. Four neighbors of the New Hope Home spoke in opposition citing the spacing requirement and the saturation of group homes in the area as reasons. The City Council voted 4-2-1 to deny the special use permit.

36. Dan Welch, a City Council member for five years, voted to deny the special use permit because of the city ordinance on spacing requirements, but testified that he thought it was a good use of the property.

37. Vokal voted to deny the special use permit because of spacing requirements. Vokal stated the neighborhood had done its "fair share" because of the Santa Monica house across the street. (Def.'s Ex. 122 at 13.) Vokal informed the City Council that New Hope was to appear before the ZBA in June. (Def.'s Ex. 122 at 23.)

38. Mark Kraft, a City Council member from 1997-2005, voted to deny the special use permit. He testified at trial that his

concerns were the congestion of traffic, parking, and concerns of the neighborhood, but his major concern was the city ordinance regarding spacing requirements.

39. Chuck Sigerson, a City Council member for four and one-half years, voted to deny the special use permit.  He testified at trial it was because of the violation of the city ordinance regarding spacing requirements.  He did not disagree that there is a need for treatment facilities like New Hope would provide.

40. New Hope withdrew its application to the ZBA for a wavier of the spacing and parking stall requirements after the City Council denied its request for a special use permit.

41. Rod Phipps ("Phipps"), manager of the Planning Division at the time of New Hope's application, testified at trial that there was no area of concentration of group homes.

42. The City has no specific reasonable accommodation provision in its statutes.

43. Phipps testified that he did not know if the City Council had to accept a wavier from the ZBA, but he was not aware of anytime that the City did not accept a waiver from the ZBA.

44. The Hansens, owners of the Home, subsequently sold the property to Michael Narducci for $408,000 on a land contract.  Narducci is currently using the home as a private residence, but indicated he would sell the home for the

-12-

"right price."

## Conclusions of Law

1.  The City did not intentionally discriminate against New Hope.

2.  The City failed to make a reasonable accommodation in not granting a special use permit to New Hope.

## Discussion

1.  The Fair Housing Act ("AHA") prohibits a municipality from discriminating against persons with disabilities "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of-(A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." 42. U.S.C. § 3604 (f)(1).

2.  Residents and prospective residents of group home for recovering alcoholics and drug addicts were persons with a "handicap" within meaning of the FHA. *See Tsombanidis v. City of West Haven*, 180 F.Supp.2d 262 (D.Conn. 2001), *aff'd in part, rev'd in part,* 352 F.3d 565 (2nd Cir. 2003).

3.  Congress explicitly intended for the FHA to apply to zoning ordinances and other laws that would restrict the placement of group homes. *Oconomowoc Residential Programs, Inc. v. City of Milwaukee,* 300 F.3d 775, 782 (7th Cir. 2002) (citing H.R.Rep.

-13-

No. 100-711, at 24 (1988)).

4.   Discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.   42 U.S.C. § 3604 (f)(3)(B).

5.   A plaintiff may show discrimination which would be a violation of the FHA or ADA in three ways, to wit:   (1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to make a reasonable accommodation.   *Tsombanidis* at 283.   As plaintiff has not alleged discriminatory impact, the Court will analyze intentional discrimination and a refusal to make a reasonable accommodation.

**Intentional discrimination**

6.   To establish intentional discrimination, plaintiff must prove that a motivating factor behind the City's refusal to grant plaintiff a special use permit was the residents' status as recovering drug addicts and alcoholics.   *See Vill. of Arlington Heights. V. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).   "The critical inquiry is whether a discriminatory purpose was a 'motivating factor' in the decision or actions" of the City.   *Tsombanidis*, 129 F.Supp.2d at 151.

7.   Factors to be considered in evaluating a claim of intentional

-14-

discrimination under the FHA or ADA include: (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; (5) departures from normal substantive criteria; and (6) legislative or administrative history, especially contemporary statements by members of the decision-making body. *See Arlington Heights* at 267-268. *See also Tsombanidis* 352 F. 3d. 565, 580.

8. This Court concludes that a discriminatory purpose was not a motivating factor in the decision of the City Council to deny Plaintiff a special use permit. At the May 25, 2004, City Council meeting, the record is replete with statements by the City Council members that they were voting to deny the special use permit based on the spacing requirement. While there are suggestions of politics and appeals to voters in the impacted area, the Court can only conclude the City did not intentionally discriminate against Plaintiff.

9. Even if Plaintiff had shown a discriminatory purpose was a motivating factor, Defendant has shown it would have made the same decision in light of a discriminatory purpose. Once plaintiffs show that defendant's decision was motivated at least in part by discriminatory animus, the burden shifts to the defendant to prove that it would have made the same

-15-

decision even if it had not been motivated by an unlawful purpose. *See Arlington Heights,* 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21. Each City Council member who testified at trial stated the opposition to the special use permit was because of the ordinance regarding the spacing requirement.

10. Plaintiff argues that the only reason it was denied a special use permit was the City's claim that the area around the Home had too many group homes for persons with disabilities and that the neighbors had done their "fair share". Based on the testimony presented at trial, we disagree.

**Reasonable accommodation**

11. Discrimination, under the FHA, includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B). The FHA requires accommodation if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

12. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Like

the FHA, under the ADA, a public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices, or services when needed.  *Oconomowoc Residential Programs, Inc., v. City of Milwaukee,* 300 F.3d 775 (7th Circ. 2002).  The requirements for reasonable accommodation under the ADA are the same as those under the FHA.  42 U.S.C. § 12131(2).

13.  An accommodation is reasonable if it is "necessary to afford a handicapped person the equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B).

14.  The Eighth Circuit requires a plaintiff to make an initial showing that an accommodation is reasonable, but then places the burden on the defendant to show that the accommodation is unreasonable.  *See e.g., Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999).  An "unreasonable accommodation" imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program.  *Oconomowoc Residential Programs, Inc., v. City of Milwaukee,* 300 F.3d 775 (7th Circ. 2002).

15.  Whether a requested accommodation is necessary for purposes of ADA and FHA requires a showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.  *Oconomowoc*, 300 F.3d at 784.

-17-

16. The City contends that the reasonable accommodation claim cannot be presented because New Hope failed to pursue the City's established procedure for waiving the zoning code requirements. The City cites *Oxford House-C v. City of St. Louis,* 77 F.3d 249, (8th Cir. 1996), to support this proposition. In *Oxford House-C*, the court found that the Plaintiff's refusal to apply for a zoning variance was fatal to their reasonable accommodation claim. *Id.* at 253. New Hope argues that in *Oxford House-C* and the other cases relied upon by the City, the plaintiffs refused to apply for a variance or use permit and that New Hope did not refuse and we agree with New Hope. The cases cited by the attorney are distinguishable from the present case for New Hope applied for a waiver from the ZBA based on the recommendation from the Planning Board, but withdrew it only after the City Council voted to deny the special use permit. We find New Hope's reasonable accommodation claim can and should be resolved.

17. New Hope asked the City to make a reasonable accommodation from the zoning ordinance in granting the special use permit. New Hope asserts that waving the zoning ordinance is reasonable because there is an undisputed need in the community for residential treatment facilities for women recovering from drug and alcohol addiction. Santa Monica House is the only other residential treatment facility for

-18-

women in Omaha. There is a waiting period of up to six months for those seeking treatment. New Hope would provide a residential setting for the women to develop support to help improve their chance of recovery.

18. New Hope also asserts the accommodation is necessary to "meet the extraordinary demand for community-based residential treatment for persons recovering from alcoholism and drug addiction." The waiting period for a woman wanting to enter treatment is up to six months. Residents of the Home would have easy access to transportation, job opportunities, and healthcare services. We find the accommodation to be necessary as it would affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability. We also find the accommodation to be reasonable as it will afford a handicapped person the equal opportunity to use and enjoy the Home. The burden then shifts to the City to show the accommodation is unreasonable.

19. While the City does not dispute the need for residential treatment facilities in Omaha, it argues the accommodation is unreasonable because it would require a fundamental alteration of the City zoning regulation, specifically a 94 percent reduction of the spacing requirement. The spacing requirement was enacted to control the concentration of group care facilities.

-19-

20. Granting a special use permit to allow two group care facilities to co-exist within one-half mile of each other admittedly results in an alteration of the zoning code, but it is not a fundamental alteration.  Phipps testified that there was no saturation of group homes anywhere in the city.  Therefore, the granting of a special use permit would not result in the concentration of group homes the spacing requirement was enacted to prevent.  New Hope sought to locate a residential facility in a commercially zoned area where uses such as hospital services, hotels/motels, and emergency residential care could locate as a matter of right.  The Planning Department recommended the approval of the special use permit stating that the "residential nature of this facility would be compatible with the character of the neighborhood."  The Planning director, who was aware of another group care facility nearby, noted in a memo to the Planning board, that the proposed re-use was residential in nature and protected the character of the existing house; that there would be comparably low impact on the neighborhood; and that residents would be closely supervised and make minimal traffic demands on the area.

20. This Court finds that the City failed to make a reasonable accommodation in granting New Hope a special use permit to occupy the Home for use as a residential drug treatment

-20-

facility for women.

### Injunctive Relief and Damages

1.  New Hope is awarded $2,263.50 in compensatory damages for the losses incurred in preparation of purchasing the Home.   The loss of net income is too speculative for the Court to consider at this time.   The $2,000 escrow amount may be an appropriate element of damages if those funds are not utilized as part of the payment for the purchase of the Home.

2.  New Hope is awarded reasonable attorney's fees and costs.  New Hope is ordered to file within 30 days of entry of this judgment, a motion detailing such fees and costs.

3.  New Hope is given 120 days within which to attempt to purchase the Home located at 101 North 39th Street, Omaha, Nebraska. Depending upon purchase price, the Court will consider additional damages if New Hope is able to purchase the Home.

4.  If the purchase is effected and upon application by New Hope for a permit to operate a group home at 101 North 39th Street, Omaha, an injunction is issued requiring the City to grant New Hope any and all necessary permits to operate the Home as a reasonable accommodation, except the City reserves the right to assure that the Home is operated according to all codes and other legal requirements.

### Order

Based on the foregoing, the Court concludes that Defendant failed to make a reasonable accommodation in granting Plaintiff a

-21-

special use permit.  Accordingly, judgment is for the Plaintiff.
Plaintiff is awarded $2,263.50 in compensatory damages, reasonable
attorney's fees and costs, injunctive relief as provided herein to
obtain necessary permits to operate the Home, and other monetary
and equitable relief to be determined.


　　　IT IS SO ORDERED.

　　　　　　　　　　　　　　　/s/Robert T. Dawson___
　　　　　　　　　　　　　　　Robert T. Dawson
　　　　　　　　　　　　　　　United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

NEW HOPE FELLOWSHIP, INC.                        PLAINTIFF

        vs.              CASE No. B:04CV259

CITY OF OMAHA, NEBRASKA                          DEFENDANT

### MEMORANDUM OPINION

This matter is before the Court for decision following a one
and one-half day trial that began on October 31, 2005.  The parties
were given until December 2, 2005 to submit simultaneous, post-
trial briefs.   Those briefs, as well as the pre-trial briefs,
summary judgment briefs, and testimony and evidence submitted at
trial, have been considered by the Court.

Plaintiff brings this action under the Fair Housing Act, as
amended, Title 42 U.S.C. § 3601, *et seq.,* the Americans with
Disabilities Act, 42 U.S.C. § 12131, *et seq.,* and the
Rehabilitation Act of 1973, 29 U.S.C. § 794, *et seq.* Plaintiff
alleges that Defendant discriminated against it by failing to grant
it a special use permit to occupy a home as a residential treatment
center for individuals recovering from alcohol and drug addiction.
Defendant denies all allegations of the Plaintiff's and contends
that Plaintiff failed to seek a waiver of a requirement of the
special use permit.

The following will constitute the Court's findings of fact and
conclusions of law pursuant to Rule 52 of the Federal Rules of

-1-

Civil Procedure.

## **Findings of Fact**

1.   New Hope ("New Hope") is a non-profit charitable "501(c)(3)" corporation, organized under the laws of the State of Nebraska, with its principal place of business in Omaha, with the mission to provide community-based residential treatment for persons recovering from alcoholism and drug addiction.

2.   The City of Omaha ("City") is a political subdivision in Douglas County, Nebraska, organized and existing as a city of the metropolitan class pursuant to the laws of the State of Nebraska.

3.   Kathleen McCallister ("McCallister") is a Douglas County Commissioner with seventeen years in public service.  In 2002 or 2003, McCallister identified a need for women leaving jail to find substance abuse treatment.  There is a shortage of community-based residential treatment facilities in the area for there is a six-month waiting period for admission.

4.   McCallister and others obtained an existing corporation, and renamed it New Hope Fellowship, Inc.  New Hope was to provide community-based residential treatment to women recovering from alcohol and/or drug addiction.

5.   Persons recovering from alcohol and/or drug addiction are persons with disabilities under the Fair Housing Act, Section 504 of the Rehabilitation Act of 1973, and the Americans with

-2-

Disabilities Act.

6.    In December of 2003, New Hope sought to purchase a house
      located at 101 North 39th Street in Omaha for use as a
      residential treatment facility ("Home").  The Home contained
      approximately 6,000 square feet of living space in eight
      bedrooms and six to seven bathrooms and was priced at
      $380,000, and the sale was contingent upon inspection,
      appraisal, and approval by all required governmental boards
      for use as a residential drug treatment facility. (Def.'s Ex.
      123.)

7.    New Hope expended $4,263.50 in preparation of purchasing the
      Home: $1,643.50 architectural services, $60 mold and radon
      testing, $560 property inspection, and $2,000 in earnest
      money. (Pl.'s Exs. 13-15.)

8.    The Home is located at the northeast corner of 39th and Dodge
      Street, which is a main thoroughfare and  heavily traveled.
      Residents of the home would have easy access to public
      transportation, health care facilities, and job opportunities.

9.    New Hope needed to house 16 to 20 women in the Home in order
      to be financially viable.  The women would be recovering from
      drug or alcohol abuse, demonstrate sobriety of at least 30
      days, and be willing to stay from six months up to one year.
      New Hope would receive referrals from McCallister, a Yellow
      Pages advertisement, local churches, Douglas County Drug

-3-

Court, and individuals. New Hope would employ persons to be in the Home 24 hours a day, seven days a week. Residents would not be allowed to drive or have automobiles at the Home.

10. New Hope would provide on-site alcohol and drug counseling and drug testing to ensure that residents remain clean and sober.

11. Omaha Municipal Code Chapter 55 contains the zoning regulations for the City. Sections 55-41 through 55-51 contain definitions for the various classifications of uses that occur in the City. Chapter 55 divides the City into various zoning districts, as described at §§ 55-61 through 55-70. The regulations for a zoning district set forth the following: uses that are "permitted" as of right; uses that are allowed only upon issuance of a conditional use permit; and uses that are allowed only upon issuance of a special use permit.

12. The Home is located on property that is zoned community commercial (CC). This property has been zoned CC for the past 20 - 30 years. In the CC district, permitted uses are listed in § 55-363; uses allowed only upon issuance of a conditional use permit are listed in § 55-364; and uses allowed only upon issuance of a special use permit are listed in § 55-365. As a CC zone, the Home could be used as a pawnshop, gas station, cocktail lounge, liquor store, restaurant, emergency residential care, hospital services, day care, hotel/motel, or

-4-

other similar commercial use as a matter of right.

13. The property adjacent to the Home to the east is zoned CC.

14. The property adjacent to the Home to the west is zoned GC-General Commercial. There is a former Travel Lodge on this site.

15. The property adjacent to the Home to the south is also zoned GC-General Commercial. There is a commercial business, Paycheck Advance, on this site.

16. The property adjacent to the Home to the north is zoned R-7 Medium Density Residential. R-7 is a residential classification intended for residential uses from single-family to multi-family.

17. To the southwest of the Home is a University of Nebraska at Omaha, Pi Kappa Alpha social fraternity residence.

18. Within two blocks of the Home, there are commercial enterprises to include a gas station, Subway sandwich shop, laundry, cigarette shop, and Taco Bell.

19. All of the properties located between Davenport Street to Douglas Street and between 38th Street and 40th Street are zoned for either commercial or multi-family residential use.

20. On or about January 12, 2004, New Hope filed an application for a special use permit, pursuant to the zoning regulations for a CC district, to operate the Home as a residence for women recovering from alcoholism and drug addiction. (Def.'s

-5-

Ex. 103.)

21.  The City Planning Department helped McAllister complete the application.   After a discussion with officials about the proposed use of the Home, on the application, in the blank after the term "proposed use type," McCallister filled in the term "group care facility."[1]

22.  In the CC district, a group care facility must obtain a special use permit.[2]  A group care facility is also subject to a spacing requirement.[3]

23.  The Planning Department reviewed New Hope's application and issued its Recommendation Report on January 26, 2004.  (Def.'s Ex. 106.)  The Planning Department recommended to the Planning

---

[1]Omaha Municipal Code § 55-46(1) defines the use type "group care facility" as a facility licensed or approved by the state or other appropriate agency, which provides for the care and short- or long-term overnight occupancy of more than three unrelated persons who require supervision while under a program alternative to imprisonment, including but not limited to pre-release, work release, and probationary programs.

Omaha Municipal Code § 55-764(c)(2) requires the applicant for a permit to operate a "group care facility" to provide the City with the following information: a) the names and address of individuals operating the facility; b) a description of the services that the facility will provide; c) the maximum number of staff and residents of the facility; d) copies of licenses or applications for licenses to operate the facility obtained from or submitted to appropriate public agencies or departments; and e) the location of any other group care facilities operated by the applicant.

[2]The procedure for obtaining a special use permit is described in Omaha Municipal Code § 55-864: The Planning Department and planning director review the proposal and prepare a recommendation.  That recommendation is presented to the City Planning Board.  The Planning Board holds a public hearing on the application, and renders a recommendation.  The recommendations are ten transmitted tot he City Council for approval or denial of the special use permit. Conditions can be placed on the special use permit, in addition to the supplemental use regulations from Omaha Municipal Code § 55-764(c).

[3]Omaha Municipal Code § 55-764(c)(1):  The distance between a proposed group care facility and any existing group care facility shall be at least one-half mile, measured between nearest lot lines.

Board that it approve New Hope's request for a special use permit stating that "the residential nature of the facility would be compatible with the character of the neighborhood", and subject to the following conditions: (1) Providing a minimum of ten on-site parking stalls or receiving a Zoning Board of Appeals ("ZBA") waiver; and (2) Compliance with the site and operating plans.   The Planning Department then forwarded its recommendation to the Planning Board for a hearing and approval of the special use permit.

24.   During the time that New Hope's special use permit application was pending, the neighbors and/or surrounding neighborhood associations alerted the City Planning Department that another "group care facility" was operating within one-half mile of the Home.

25.   City Planner Gary Hall determined the Santa Monica House had been issued a certificate of occupancy for a group care facility at 130 North 39th Street.   The Santa Monica House was across the street, and two lots down, from the proposed Home. Hall determined that the two facilities were located 155.5 feet apart, measured from the nearest lot lines.

26.   The City received numerous letters and e-mails from neighbors surrounding the Home, which were distributed to the Planning Board and the City Council for their consideration, most encouraging the City to deny New Hope's application for a

special use permit.  The letters included one from the Mayor
of Omaha, Mike Fahey.  (Pl.'s Ex. 11.)

27. On February 4, 2004, and on March 3, 2004, the Planning Board
held public hearings to consider the special use permit for
the Home.  At these public hearings, the Planning Board voted
unanimously to "lay over" the decision on the application
until New Hope could meet with the neighbors and all the
Planning Board members could be in attendance, respectively.

28. On March 30, 2004, the Planning Department provided a
Memorandum to the Planning Board that noted the other group
care facility operating within the one-half mile separation
zone, but maintained that the City should nonetheless issue
the permit subject to the previous conditions regarding
parking spaces and compliance with site and operating plans.
(Def.'s Ex. 113.)  The Memorandum set out the analysis that
the property is zoned to a commercial classification; the
proposed re-use is residential in nature and protects the
character of the existing house; the proposed group care
facility would have a comparably low impact on the
neighborhood; the residents are closely supervised and make
minimal traffic demands on the area; and the home is
sufficiently large enough to accommodate the residents.  In
addition, the Planning Department proposed that the property
be "down-zoned" to a single-family residential classification

as a condition of granting the special use permit.  The City

may impose conditions such as down-zoning of the property when

approving a special use permit.

29.  No other lots within a two block radius of the Home are zoned

R-5.  (Def.'s Ex. 104.)

30.  On March 5, 2004, the counsel for New Hope, directed a three-

page letter to the City requesting the City to reclassify the

proposed use of the Home to "Group Residential".[4]  (Def.'s Ex.

111.)  Moore stated the Home would not be a facility that

would house persons "who require supervision while under a

program alternative to imprisonment" making a group care

facility classification inappropriate.  In the CC district, a

group residential must only obtain a conditional use permit.[5]

31.  On March 15, 2004, the City, through its attorney, responded

to New Hope's letter concluding that the proposed use of the

home "fits most appropriately" under the use type defining of

"Group Care Facility."  (Def.'s Ex. 112.)  The City's letter

informed New Hope that the Planning Department would

nonetheless recommend that the City approve the special use

permit.  The City also indicated it would support a variance

_____

[4]Omaha Municipal Code § 55-43(f) defines "group residential": The use of
a site for a residence by more than three unrelated persons, not defined as
a family, on a weekly or longer basis.  This use includes a group of handicapped
persons living as a family unit while receiving on-premises care.

[5]The conditional use permit procedure is similar to that of the special
use permit procedure, except that a conditional use permit is issued by the
Planning Board and not the City Council.  In addition, a group residential use
is subject to supplemental use regulations at § 55-763(c).

or waiver from the separation requirement from the ZBA and
that the Planning Department intended to draft a
recommendation to repeal the separation requirement in Code §
55-764.

32. On April 7, 2004, at the Planning Board meeting, New Hope
requested a reasonable accommodation to operate the New Hope
Home because the residents of the home would be persons with
disabilities pursuant to the FHA, ADA, and other applicable
statutes. (Def.'s Ex. 115 at 13.) Eight neighbors of the New
Home appeared and voiced opposition to the location, including
Jim Vokal, an Omaha City Council member. The Home is located
in his district. The Planning Board voted 6 to 1 in favor of
recommending approval of New Hope's special use permit to the
City Council subject to: 1) Providing a minimum of 10 on-site
parking stalls or receipt of a ZBA waiver; 2) Compliance with
the site and operating plans; 3) That the applicant agrees to
apply to re-zone the property to a R5 residential
classification once they are in operation; and 4) That the
applicant request a waiver of the spacing requirement from the
ZBA. (Def.'s Ex. 115 at 50.)

33. On May 3, 2004, New Hope filed an application with the ZBA for
a waiver of the parking space and spacing requirements.
(Def.'s Ex. 116.) The ZBA placed New Hope's application on
its June agenda.

34. Also on May 3, 2004, Moore sent a letter to the City Planning Department appealing New Hope's classification of a "group care facility" and requesting a waiver/variance of the parking and spacing requirements as a reasonable accommodation. (Pl.'s Ex. 3.)

35. On May 25, 2004, New Hope appeared before the City Council to request a special use permit to operate the treatment facility as a matter of right or as a reasonable accommodation to persons of disabilities. Four neighbors of the New Hope Home spoke in opposition citing the spacing requirement and the saturation of group homes in the area as reasons. The City Council voted 4-2-1 to deny the special use permit.

36. Dan Welch, a City Council member for five years, voted to deny the special use permit because of the city ordinance on spacing requirements, but testified that he thought it was a good use of the property.

37. Vokal voted to deny the special use permit because of spacing requirements. Vokal stated the neighborhood had done its "fair share" because of the Santa Monica house across the street. (Def.'s Ex. 122 at 13.) Vokal informed the City Council that New Hope was to appear before the ZBA in June. (Def.'s Ex. 122 at 23.)

38. Mark Kraft, a City Council member from 1997-2005, voted to deny the special use permit. He testified at trial that his

-11-

concerns were the congestion of traffic, parking, and concerns of the neighborhood, but his major concern was the city ordinance regarding spacing requirements.

39. Chuck Sigerson, a City Council member for four and one-half years, voted to deny the special use permit. He testified at trial it was because of the violation of the city ordinance regarding spacing requirements. He did not disagree that there is a need for treatment facilities like New Hope would provide.

40. New Hope withdrew its application to the ZBA for a wavier of the spacing and parking stall requirements after the City Council denied its request for a special use permit.

41. Rod Phipps ("Phipps"), manager of the Planning Division at the time of New Hope's application, testified at trial that there was no area of concentration of group homes.

42. The City has no specific reasonable accommodation provision in its statutes.

43. Phipps testified that he did not know if the City Council had to accept a wavier from the ZBA, but he was not aware of anytime that the City did not accept a waiver from the ZBA.

44. The Hansens, owners of the Home, subsequently sold the property to Michael Narducci for $408,000 on a land contract. Narducci is currently using the home as a private residence, but indicated he would sell the home for the

-12-

"right price."

## Conclusions of Law

1. The City did not intentionally discriminate against New Hope.

2. The City failed to make a reasonable accommodation in not granting a special use permit to New Hope.

## Discussion

1. The Fair Housing Act ("AHA") prohibits a municipality from discriminating against persons with disabilities "in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of-(A) that buyer or renter, (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter."  42. U.S.C. § 3604 (f)(1).

2. Residents and prospective residents of group home for recovering alcoholics and drug addicts were persons with a "handicap" within meaning of the FHA. *See Tsombanidis v. City of West Haven*, 180 F.Supp.2d 262 (D.Conn. 2001), *aff'd in part, rev'd in part,* 352 F.3d 565 (2nd Cir. 2003).

3. Congress explicitly intended for the FHA to apply to zoning ordinances and other laws that would restrict the placement of group homes. *Oconomowoc Residential Programs, Inc. v. City of Milwaukee,* 300 F.3d 775, 782 (7th Cir. 2002) (citing H.R.Rep.

-13-

No. 100-711, at 24 (1988)).

4.   Discrimination includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604 (f)(3)(B).

5.   A plaintiff may show discrimination which would be a violation of the FHA or ADA in three ways, to wit: (1) intentional discrimination; (2) discriminatory impact; and (3) a refusal to make a reasonable accommodation. *Tsombanidis* at 283. As plaintiff has not alleged discriminatory impact, the Court will analyze intentional discrimination and a refusal to make a reasonable accommodation.

**Intentional discrimination**

6.   To establish intentional discrimination, plaintiff must prove that a motivating factor behind the City's refusal to grant plaintiff a special use permit was the residents' status as recovering drug addicts and alcoholics. *See Vill. of Arlington Heights. V. Metro. Housing Dev. Corp.,* 429 U.S. 252, 265-66, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). "The critical inquiry is whether a discriminatory purpose was a 'motivating factor' in the decision or actions" of the City. *Tsombanidis*, 129 F.Supp.2d at 151.

7.   Factors to be considered in evaluating a claim of intentional

-14-

discrimination under the FHA or ADA include: (1) the discriminatory impact of the governmental decision; (2) the decision's historical background; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; (5) departures from normal substantive criteria; and (6) legislative or administrative history, especially contemporary statements by members of the decision-making body. *See Arlington Heights* at 267-268. *See also Tsombanidis* 352 F. 3d. 565, 580.

8.    This Court concludes that a discriminatory purpose was not a motivating factor in the decision of the City Council to deny Plaintiff a special use permit. At the May 25, 2004, City Council meeting, the record is replete with statements by the City Council members that they were voting to deny the special use permit based on the spacing requirement. While there are suggestions of politics and appeals to voters in the impacted area, the Court can only conclude the City did not intentionally discriminate against Plaintiff.

9.    Even if Plaintiff had shown a discriminatory purpose was a motivating factor, Defendant has shown it would have made the same decision in light of a discriminatory purpose. Once plaintiffs show that defendant's decision was motivated at least in part by discriminatory animus, the burden shifts to the defendant to prove that it would have made the same

-15-

decision even if it had not been motivated by an unlawful purpose. *See Arlington Heights,* 429 U.S. at 270 n. 21, 97 S.Ct. at 566 n. 21. Each City Council member who testified at trial stated the opposition to the special use permit was because of the ordinance regarding the spacing requirement.

10. Plaintiff argues that the only reason it was denied a special use permit was the City's claim that the area around the Home had too many group homes for persons with disabilities and that the neighbors had done their "fair share". Based on the testimony presented at trial, we disagree.

**Reasonable accommodation**

11. Discrimination, under the FHA, includes a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B). The FHA requires accommodation if such accommodation (1) is reasonable, and (2) necessary, (3) to afford a handicapped person the equal opportunity to use and enjoy a dwelling. 42 U.S.C. § 3604(f)(3)(B).

12. Under the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Like

-16-

the FHA, under the ADA, a public entity must reasonably accommodate a qualified individual with a disability by making changes in rules, policies, practices, or services when needed. *Oconomowoc Residential Programs, Inc., v. City of Milwaukee,* 300 F.3d 775 (7th Circ. 2002). The requirements for reasonable accommodation under the ADA are the same as those under the FHA. 42 U.S.C. § 12131(2).

13. An accommodation is reasonable if it is "necessary to afford a handicapped person the equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).

14. The Eighth Circuit requires a plaintiff to make an initial showing that an accommodation is reasonable, but then places the burden on the defendant to show that the accommodation is unreasonable. *See e.g., Fjellestad v. Pizza Hut of America, Inc.*, 188 F.3d 944, 950 (8th Cir. 1999). An "unreasonable accommodation" imposes undue financial or administrative burdens or requires a fundamental alteration in the nature of the program. *Oconomowoc Residential Programs, Inc., v. City of Milwaukee,* 300 F.3d 775 (7th Circ. 2002).

15. Whether a requested accommodation is necessary for purposes of ADA and FHA requires a showing that the desired accommodation will affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability. *Oconomowoc*, 300 F.3d at 784.

-17-

16.  The City contends that the reasonable accommodation claim
     cannot be presented because New Hope failed to pursue the
     City's established procedure for waiving the zoning code
     requirements.  The City cites *Oxford House-C v. City of St.
     Louis,* 77 F.3d 249, (8th Cir. 1996), to support this
     proposition.  In *Oxford House-C*, the court found that the
     Plaintiff's refusal to apply for a zoning variance was fatal
     to their reasonable accommodation claim.  *Id.* at 253.  New
     Hope argues that in *Oxford House-C* and the other cases relied
     upon by the City, the plaintiffs refused to apply for a
     variance or use permit and that New Hope did not refuse and we
     agree with New Hope.  The cases cited by the attorney are
     distinguishable from the present case for New Hope applied for
     a waiver from the ZBA based on the recommendation from the
     Planning Board, but withdrew it only after the City Council
     voted to deny the special use permit.  We find New Hope's
     reasonable accommodation claim can and should be resolved.

17.  New Hope asked the City to make a reasonable accommodation
     from the zoning ordinance in granting the special use permit.
     New Hope asserts that waving the zoning ordinance is
     reasonable because there is an undisputed need in the
     community for residential treatment facilities for women
     recovering from drug and alcohol addiction.  Santa Monica
     House is the only other residential treatment facility for

-18-

women in Omaha.  There is a waiting period of up to six months for those seeking treatment.  New Hope would provide a residential setting for the women to develop support to help improve their chance of recovery.

18.  New Hope also asserts the accommodation is necessary to "meet the extraordinary demand for community-based residential treatment for persons recovering from alcoholism and drug addiction."  The waiting period for a woman wanting to enter treatment is up to six months.  Residents of the Home would have easy access to transportation, job opportunities, and healthcare services.  We find the accommodation to be necessary as it would affirmatively enhance a disabled plaintiff's quality of life by ameliorating the effects of the disability.  We also find the accommodation to be reasonable as it will afford a handicapped person the equal opportunity to use and enjoy the Home.  The burden then shifts to the City to show the accommodation is unreasonable.

19.  While the City does not dispute the need for residential treatment facilities in Omaha, it argues the accommodation is unreasonable because it would require a fundamental alteration of the City zoning regulation, specifically a 94 percent reduction of the spacing requirement.  The spacing requirement was enacted to control the concentration of group care facilities.

-19-

20.  Granting a special use permit to allow two group care
     facilities to co-exist within one-half mile of each other
     admittedly results in an alteration of the zoning code, but it
     is not a fundamental alteration.  Phipps testified that there
     was no saturation of group homes anywhere in the city.
     Therefore, the granting of a special use permit would not
     result in the concentration of group homes the spacing
     requirement was enacted to prevent.  New Hope sought to locate
     a residential facility in a commercially zoned area where uses
     such as hospital services, hotels/motels, and emergency
     residential care could locate as a matter of right.  The
     Planning Department recommended the approval of the special
     use permit stating that the "residential nature of this
     facility would be compatible with the character of the
     neighborhood."  The Planning director, who was aware of
     another group care facility nearby, noted in a memo to the
     Planning board, that the proposed re-use was residential in
     nature and protected the character of the existing house; that
     there would be comparably low impact on the neighborhood; and
     that residents would be closely supervised and make minimal
     traffic demands on the area.

20.  This Court finds that the City failed to make a reasonable
     accommodation in granting New Hope a special use permit to
     occupy the Home for use as a residential drug treatment

facility for women.

## Injunctive Relief and Damages

1.  New Hope is awarded $2,263.50 in compensatory damages for the losses incurred in preparation of purchasing the Home.  The loss of net income is too speculative for the Court to consider at this time.  The $2,000 escrow amount may be an appropriate element of damages if those funds are not utilized as part of the payment for the purchase of the Home.

2.  New Hope is awarded reasonable attorney's fees and costs.  New Hope is ordered to file within 30 days of entry of this judgment, a motion detailing such fees and costs.

3.  New Hope is given 120 days within which to attempt to purchase the Home located at 101 North 39th Street, Omaha, Nebraska. Depending upon purchase price, the Court will consider additional damages if New Hope is able to purchase the Home.

4.  If the purchase is effected and upon application by New Hope for a permit to operate a group home at 101 North 39th Street, Omaha, an injunction is issued requiring the City to grant New Hope any and all necessary permits to operate the Home as a reasonable accommodation, except the City reserves the right to assure that the Home is operated according to all codes and other legal requirements.

## Order

Based on the foregoing, the Court concludes that Defendant failed to make a reasonable accommodation in granting Plaintiff a

-21-

special use permit.  Accordingly, judgment is for the Plaintiff.
Plaintiff is awarded $2,263.50 in compensatory damages, reasonable
attorney's fees and costs, injunctive relief as provided herein to
obtain necessary permits to operate the Home, and other monetary
and equitable relief to be determined.


        IT IS SO ORDERED.

                              /s/Robert T. Dawson____
                              Robert T. Dawson
                              United States District Judge